## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CHILDREN'S HOSPITAL CORPORATION d/b/a
BOSTON CHILDREN'S HOSPITAL,

                Plaintiff,

    v.

HIS ROYAL HIGHNESS PRINCE ABDELILAH
BIN ABDELAZIZ BIN ABDULRAHMAN AL
FAISAL AL SAUD OF SAUDI ARABIA AND DR.
HAMDY DAWOUD,

                Defendants.

Civil Action No.

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff Children's Hospital Corporation, d/b/a Boston Children's Hospital ("BCH"), by and through its undersigned attorneys, brings this action against Defendants His Royal Highness Prince Abdelilah bin Abdelaziz bin Abdulrahman Al Faisal Al Saud of Saudi Arabia ("the Prince") in his individual capacity, and Dr. Hamdy Dawoud ("Dr. Hamdy"), and hereby states and alleges the following:

## INTRODUCTION

1.    This is an action for breach of contract, promissory estoppel, and charitable subscription by Boston Children's Hospital against the Prince and Dr. Hamdy, the Prince's personal representative and agent, to recover unpaid medical bills currently totaling approximately $3.5 million as of the filing of this complaint.  The Prince and Dr. Hamdy agreed to sponsor and pay for the care of Jane Doe (hereinafter, "Jane Doe" or the "patient") at Boston Children's Hospital.

2.      Based on that agreement, and at the request of personnel at another Boston-area hospital, Boston Children's Hospital accepted the patient and has been treating the patient in the hospital since November 2017.

3.      To date, the Prince and Dr. Hamdy, acting as the Prince's agent, have paid only $750,000 toward the patient's care despite repeated promises that additional payment will be forthcoming.

4.      BCH has continued to care for this patient at great expense and burden to BCH. BCH seeks immediate payment of all unpaid bills with interest to allow it to continue serving Jane Doe and the other patients in its care.

## THE PARTIES

5.      BCH is a not-for-profit pediatric medical center located in Boston, Massachusetts. As one of the largest pediatric medical centers in the world, BCH offers a complete range of pediatric health care services.  In addition to serving children from across the United States, BCH is a worldwide leader in pediatric care and the treatment of complex diseases and conditions, serving many children from outside of the United States each year.  BCH is incorporated as a chapter 180 charitable corporation under the laws of Massachusetts, is a registered charity in Massachusetts and is exempt from taxation under section 501(c)(3) of the Internal Revenue Code.

6.      The Prince is a member of the royal family of Saudi Arabia and citizen of Saudi Arabia whose primary residence is in Saudi Arabia.  The Prince travels to Boston, Massachusetts on a regular basis to receive healthcare services at Brigham and Women's Hospital ("BWH").  The Prince has also visited the patient and her family at BCH.

7.      Dr. Hamdy, a citizen of Egypt, is the Prince's physician and representative with regard to the patient's case.  Dr. Hamdy has accompanied the Prince when the Prince travels to Boston, and Dr. Hamdy has also visited Jane Doe and her family at BCH.

8.      At all relevant times, Dr. Hamdy was acting as the Prince's duly authorized agent.

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between a citizen of Massachusetts and citizens or subjects of a foreign state, namely Saudi Arabia and Egypt.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the District of Massachusetts.

## FACTS

**I.    The Prince and His Representatives Encouraged Boston Children's Hospital to Accept the Patient, and the Prince Agreed to Sponsor the Patient's Care.**

11.     The patient is an approximately two-year-old child who has spinal muscular atrophy ("SMA") Type 1.  The patient is not a citizen of the United States and is a citizen of a foreign country.

12.     SMA is a rare genetic disease affecting muscle strength and movement.  Type 1 SMA requires life-long treatment.  The drug used to treat SMA, Spinraza$^{TM}$ (nusinersen), is the only such treatment approved by the United States Food and Drug Administration, and the Spinraza treatment that BCH provides for SMA is not available in the patient's original home country.

13.     Upon information and belief, the Prince learned about the patient through media and contacted the patient's family with an offer to sponsor her care.   The Prince, through Dr. Hamdy, and others at BWH, contacted BCH and asked that BCH admit the patient.  Dr. Hamdy and others stated that the Prince would pay for the patient's care.

14.     On November 13, 2017, Dr. Hamdy emailed Carol Saul ("Saul"), the Manager of International Programs at BCH at the time, stating that he was "the personal physician of HRH Prince Abdulelah Al Saud who is donating for the baby [Jane Doe]."  Dr. Hamdy also referred to himself as the Prince's representative.  Saul informed Dr. Hamdy that the cost for the patient's first year of care was $1.5 million, noting that the expense was in part due to the high cost of Spinraza.  In response, Dr. Hamdy asked Saul for further information and instructions on how to wire the money to BCH.

15.     Personnel at Brigham and Women's Hospital, including Ramy Ibrahim ("Ibrahim") and Dr. Philip Camp ("Dr. Camp"), encouraged BCH to accept the patient.  Specifically, such personnel wrote to Saul, on the Prince's behalf, requesting that BCH admit the patient.  Ramy Ibrahim, an International Patient Coordinator at BWH, stated that the "reason [he is] involved is because the guarantor is a member of the Saudi Royal family (a patient of [BWH]) and he will be the one paying for [Jane Doe's] treatment."  A Senior Director at BWH, Kerin Howard, later explained to Saul that Ibrahim, at the Prince's request, coordinates health care for the Prince's family and friends.

16.     Dr. Camp, a thoracic surgeon at BWH, described himself as the "Prince's surgeon and family friend," and told Saul that he is also involved in helping to coordinate care at the Prince's request.  He stated that the Prince pledged to pay for the patient's care and explained that the Prince "is entirely serious about paying the cost personally, and has the means."

17.     A few days later, Dr. Hamdy sent Saul a letter signed by the patient's parents, authorizing Dr. Hamdy, and Dr. Camp and Ibrahim of BWH, to communicate with BCH regarding the patient's care and to speak on the parents' behalf.  That same day, Saul sent Dr. Hamdy an itemized estimate for the cost of the patient's first year of care, totaling $1,550,332.  Saul explained

that, if the Spinraza treatment was successful and the patient responded, the patient would need the Spinraza treatment every four months.

18.     Shortly thereafter, Ibrahim informed Saul and Maher Seleman, a Case Coordinator at BCH, that he was "trying to get the funds transferred to [BCH] as soon as possible."

## II.   The Prince Makes an Initial $750,000 Payment to BCH Through Dr. Hamdy and Ibrahim.

19.     On November 21, 2017, Dr. Hamdy asked Saul for a wiring address to send an initial payment of $750,000.  Later that day, he told Saul that the money had been sent via wire transfer.

20.     Dr. Hamdy provided Saul with a copy of a form showing a transfer to BCH in the amount of $750,000.  Although the full account holder name was cut off, the signed International Transfer form showed the transfer of $750,000 from the account of "Abdulelah Abdulaziz Abdulrh" to BCH.

21.     The patient was admitted to BCH on November 27, 2017.  Dr. Hamdy coordinated with Saul to arrange for the patient's arrival and accompanied the patient and her family to Boston.

22.     On November 28, 2017, as a result of difficulties with the wire transfer process, Dr. Hamdy confirmed to Saul that the bank would issue a check to BCH.  Dr. Hamdy emailed Saul and Seleman a copy of the $750,000 check payable to BCH.  Dr. Hamdy asked Saul to confirm receipt so that he could declare it to the Prince.

23.     Dr. Hamdy arranged for Ibrahim to give the $750,000 check to BCH.  On December 6, 2017, Ibrahim personally handed Seleman the $750,000 check in an envelope.  The front of the envelope was pre-printed with a label stating, "Kingdom of Saudi Arabia Abdulelah Bin Abdulaziz Al Saud Private Advisor & Personal Representative office," and Jane Doe's name was hand-written across the front.

24.     At that point, BCH had already begun treatment of the patient and put the payment toward the cost of the patient's care.

## III.     BCH Has Attempted to Collect Additional Payment from the Prince but Has Been Unsuccessful.

25.     By late December 2017, due to the high cost of treatment and care needed for the patient, most of the initial $750,000 had been spent.  Saul wrote to Dr. Hamdy informing him of this fact and requesting additional funds as agreed upon.  Dr. Hamdy responded that he would talk to the Prince soon and transfer the additional requested funds.

26.     Throughout the winter and spring of 2018, BCH subsequently reached out to Dr. Hamdy on multiple occasions without receiving a response.  However, on May 28, 2018, Dr. Hamdy sent Seleman a WhatsApp message stating that he expected the Prince to visit Boston during the summer, and at that time they could "discuss the financial details for [Jane Doe] and convey these details to his highness.  Everything will be fine."

27.     BCH also attempted to reach out to the Prince himself through Dr. Camp, who, upon information and belief, was treating the Prince's brother around this time.  These attempts were unsuccessful.

28.     The patient's parents insisted that Dr. Hamdy told them that he would pay the outstanding balance before June 15, 2018, but no additional payments were made.

29.     BCH also sought assistance from the U.S. Embassy in Cairo, Egypt.  A Commercial Service Officer made contact with Dr. Hamdy in July 2018.  Dr. Hamdy confirmed to the Commercial Service Officer that the Prince was sponsoring the patient.  Shortly after Dr. Hamdy communicated with the Commercial Service Officer, BCH was able to connect with Dr. Hamdy to schedule an in-person meeting.

**IV.     Dr. Hamdy Met with BCH Personnel to Discuss Payment of the Patient's Outstanding Balance and the Expected Cost of Future Treatment.**

30.     On July 25, 2018, Dr. Camp emailed Dr. Meredith van der Velden, a BCH Associate in Critical Care Medicine, and informed her that the Prince had arrived in Boston.  Dr. Camp explained that he had met with Dr. Hamdy, who agreed to visit BCH "to meet and discuss [Jane Doe] and the situation."  Dr. Camp confirmed a meeting between BCH and Dr. Hamdy on July 30, 2018.

31.     On July 30, 2018, Dr. Hamdy and Dr. Camp met with BCH personnel including Michele Garvin, BCH's Senior Vice President and General Counsel, Cynthia Haines, BCH's Senior Vice President of International Services, Basel Tarab, a Patient Relations Specialist at BCH, and Dr. van der Velden (hereinafter, the "July 30 Meeting").  At the meeting, at Dr. Hamdy's request, BCH told Dr. Hamdy that it would prepare for him a detailed bill of the cost of the patient's care, and Dr. Hamdy said that the Prince would pay soon.  Immediately after the meeting, BCH prepared an itemized bill to present to Dr. Hamdy in hard copy as promised.

32.     However, the next day, BCH learned that Dr. Hamdy and the Prince were leaving Boston when the Prince's delegation visited BCH to say goodbye to the patient's family.  BCH attempted to reach Dr. Hamdy and present him with the bill that he had requested, but was not able to meet with him before he and the Prince left Boston.

**V.     Dr. Hamdy Continues to Confirm the Prince's Agreement to Pay.**

33.     On July 31, 2018, Haines sent a letter to Dr. Hamdy memorializing their discussion at the July 30 Meeting (the "July 31 Letter").  The letter stated the expectation of BCH that the then-outstanding balance of $1,568,440.57 would be wire transferred by August 10, 2018, stated an estimate for the next year of care if the patient's family decided that the patient should continue

to receive treatment at BCH, and stated BCH's expectation that the Prince would pay for the patient's future care in advance.

34.     The following day, Paul Pecoraro, BCH's Vice President of Patient Financial Services, sent Dr. Hamdy a detailed bill for the patient's care reflecting an outstanding balance of $1,568,440.57.

35.     On August 2, 2018, Dr. Hamdy sent a WhatsApp message to Seleman, requesting that BCH resend the letter and the detailed bill.  Later that day, Pecoraro sent Dr. Hamdy fifty-five separate emails.  The first email contained the July 31 Letter.  Due to technological issues Dr. Hamdy said he was experiencing, BCH personnel could not provide him the detailed bill in one email.  Therefore, it sent Dr. Hamdy fifty-four other emails each comprising a section of the detailed bill.

36.     On August 5, 2018, Dr. Hamdy responded that he would print the emails and discuss the issue with the Prince, stating that he would "do [his] best to resolve the issue in the nearest [sic] future."

37.     Pecoraro attempted to follow up with Dr. Hamdy by email several times over the next few days but received no response.

38.     However, on August 8, 2018, the patient's mother informed Tarab that Dr. Hamdy had received the bill.  She said that she had spoken directly to the Prince, who told her that Dr. Hamdy had updated him on the situation and that the hospital would get the money very soon.

39.     Similarly, on August 21, 2018, the patient's father informed Tarab that he had spoken directly to the Prince three days prior.  The patient's father told Tarab that the Prince confirmed that BCH would receive the payment soon, and that Dr. Hamdy had reiterated the Prince's promise that BCH would be paid soon.  Then, a few weeks later, the patient's mother told

Tarab that she had again spoken to the Prince directly, and the Prince had reassured her that he would resolve the outstanding payments by October 2018.

40.     On September 18, 2018, Pecoraro emailed Dr. Hamdy to confirm the statement made by the patient's parents that BCH would receive payment that week when the Prince returned from vacation.  Pecoraro asked Dr. Hamdy to wire transfer $2,268,440.57 to BCH that week. Pecoraro also told Dr. Hamdy that he wished to meet with him when Dr. Hamdy returned to the United States in October to discuss the additional expenses already incurred and expected to be incurred by BCH in treating the patient that were not included in the $2,268,440.57.

41.     On October 18, 2018, Pecoraro emailed Dr. Hamdy again, expressing that BCH expected Dr. Hamdy to transfer $2,515,455.45 to BCH.  This amount included BCH's unpaid charges through September 20, 2018, as well as an estimate of the cost to transfer the patient to Franciscan Children's—a children's rehabilitation facility in Brighton, Massachusetts—and the cost of her treatment there for six months.

42.     Dr. Hamdy responded later that day, saying that he would "like to convey the deep thanks and appreciation of HRH [the Prince] for your sincere efforts" and that he would be back in touch after talking to the Prince.  However, Dr. Hamdy did not respond to repeated follow-up requests from Pecoraro over the next month.

43.     On or around November 20, 2018, BCH representatives, including Cynthia Haines, met with Jane Doe's parents to discuss the care plan going forward.  Given Jane Doe's improved condition, the discussion included transferring Jane Doe to a rehabilitation facility or to a health care provider in Saudi Arabia.

44.     On November 21, 2018, Dr. Hamdy wrote in an email to Tarab and Seleman that the Prince had spoken with the patient's mother the previous evening as well as that day.  Dr.

Hamdy confirmed that the Prince "is still sponsoring [the patient]," and that the Prince would transfer the money owed to BCH "[i]n the very near future."

45.     On information and belief, in or about November 2018, Ibrahim and Dr. Hamdy assisted Jane Doe's parents in renewing their medical visas without BCH's knowledge.

46.      In another attempt to establish contact the Prince, Sandra Fenwick, the CEO of BCH, wrote to the patient's parents on December 14, 2018, and asked them to forward an attached letter to the Prince.  The letter requested that the Prince meet with Fenwick the next time that he was in Boston, because they needed to discuss the "immediate and long-term care plan for [the patient] who came to us under your sponsorship."

47.     On January 19, 2019, the patient's mother again told Seleman that she had spoken with the Prince four days prior, and that he told her that he would pay.

48.     To date, the only payment BCH has received from the Prince is the $750,000 payment made in December 2017.

49.     As of the filing of this Complaint, the patient continues to receive inpatient care at BCH, even though, as of this date, acute inpatient care is not necessary.  Although a transfer or discharge to assisted home care is warranted, it is highly unlikely that a rehabilitation facility or home care company will accept this patient without assurance of payment.

50.     As of the date of the filing of this Complaint, the unpaid balance for the patient's care is approximately $3.5 million and this amount continues to increase daily.

## COUNT ONE
### (Breach of Contract – Against All Defendants)

51.     BCH repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

52.     There was an express agreement between the Prince, through his agent Dr. Hamdy, and BCH that the Prince would pay in full for the patient's care.  On November 13, 2017, Dr. Hamdy contacted Saul and informed her that he was the Prince's personal physician and representative and that the Prince was donating the funds to pay for the patient's medical care. After Saul stated that the cost for the patient's first year of care would be $1.5 million, Dr. Hamdy responded asking for additional information and details on how to wire the money.

53.     Saul sent Dr. Hamdy an itemized estimate for the cost of the patient's care for the first year of treatment and explained that, if the provision of Spinraza was successful, it would need to be provided every four months.  On this basis, in early December 2017, Dr. Hamdy, on behalf of the Prince, paid $750,000 towards the patient's care.

54.     Since then, on multiple occasions through correspondence and at an in-person meeting with Dr. Hamdy on July 30, 2018, BCH has asked for payment for the ongoing cost of the patient's care.  Dr. Hamdy has confirmed this agreement, informing BCH personnel on more than one occasion that the Prince would pay.  Dr. Hamdy has never denied that the Prince is obligated to pay BCH.

55.     BCH has performed its obligations under the contract by accepting the patient and treating her since November 2017 through the present.  It has also provided updates to Dr. Hamdy about the patient's treatment.

56.     The Prince and Dr. Hamdy, the Prince's agent and representative, are in breach of the contract as they have failed to pay the cost of the patient's care.

57.     BCH's resulting harm is ongoing, as it has continued to treat the patient at great expense to BCH without being paid.

## COUNT TWO
### (Promissory Estoppel – Against All Defendants)

58.     BCH repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

59.     The Prince's representatives—Dr. Hamdy, Dr. Camp, and Ibrahim—made representations to BCH intended to induce BCH to accept the patient under the Prince's sponsorship.  Dr. Hamdy, Dr. Camp, and Ibrahim represented to BCH that they were acting as agents for the Prince.  In that capacity, Dr. Hamdy, Dr. Camp, and Ibrahim encouraged BCH to accept the patient, represented that the Prince would pay for her care, and asked to be kept informed about the patient's case on the Prince's behalf.

60.     BCH had a reasonable and well-founded belief that the Prince would pay for the patient's care when it accepted her as a patient and has continued to treat her.  The reasonableness of BCH's belief that the Prince was serious about sponsoring the patient's case was confirmed when Dr. Hamdy made the initial $750,000 payment.  Since then, BCH has reasonably relied on assurances of continued payment from Dr. Hamdy, Dr. Camp, and Ibrahim, as well as from representations made by the patient's parents—who are or have been in direct contact with both Dr. Hamdy and the Prince.

61.     As a result of its reasonable reliance, BCH has incurred significant financial detriment by treating the patient at its own expense.

## COUNT THREE
### (Charitable Subscription – Against All Defendants)

62.     BCH repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

63.     BCH is a registered charity in Massachusetts and is a 501(c)(3) tax-exempt, not-for-profit corporation.

64.     The Prince, via his representatives Dr. Hamdy, Dr. Camp, and Ibrahim, promised that he would pay for the patient's care.

65.     BCH reasonably relied on that promise.  The reasonableness of BCH's belief that the Prince seriously intended to sponsor the patient's treatment was confirmed when Dr. Hamdy made the initial $750,000 payment.  Since then, BCH has reasonably relied on assurances of continued payment from Dr. Hamdy, Dr. Camp, and Ibrahim, as well as from representations made by the patient's parents—who are or have been in direct contact with both Dr. Hamdy and the Prince.

66.     As consideration for the Prince's promise to pay for the patient's healthcare, BCH has treated the patient since November 2017 through the present day.  Furthermore, BCH has provided continual updates to Dr. Hamdy about the patient's treatment.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiff Boston Children's Hospital prays that this Court:

A. Enter judgment against HRH Abdelilah bin Abdelaziz bin Abdulrahman Al Faisal Al Saud of Saudi Arabia and Dr. Hamdy Dawoud on all Counts of the Complaint;

B. Award BCH actual, compensatory damages, plus applicable pre-judgment interest, caused by the defendants' failure to pay all of the patient's outstanding medical bills, which currently total approximately $3.5 million (excluding interest) and continue to accrue;

C. Grant such other and further relief, both legal and equitable, as the Court deems just and fair.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury of all issues that may be so tried.


Dated: April 9, 2019                     Respectfully submitted,

                                         BOSTON CHILDREN'S HOSPITAL

                                         By its attorneys,


                                         /s/ Jane E. Willis
                                         Jane E. Willis (BBO # 568024)
                                         Deanna Barkett FitzGerald (BBO # 679737)
                                         Ropes & Gray LLP
                                         800 Boylston Street
                                         Boston, MA 02199-3600
                                         Tel: (617) 951-7000
                                         Fax: (617) 951-7050
                                         jane.willis@ropesgray.com
                                         deanna.fitzgerald@ropesgray.com

                                         *Attorneys for Plaintiff*